**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **RONALD EUGENE BROOKS, SR.,** | ) | |
| **and MARILYN BROOKS,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| v. | ) | **No. 3:07-0507** |
| | ) | |
| **METROPOLITAN GOVERNMENT** | ) | **Judge Echols** |
| **OF NASHVILLE AND DAVIDSON** | ) | |
| **COUNTY and MARTY PATTERSON,** | ) | |
| | ) | |
| **Defendants/Cross-Plaintiffs,** | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **SHELBY COUNTY, TENNESSEE,** | ) | |
| | ) | |
| **Defendant/Cross-Defendant.** | ) | |

## MEMORANDUM

This is a civil rights action which arose after Plaintiff Ronald Eugene Brooks, Sr. ("Mr. Brooks") was detained by employees of the Davidson County Sheriff's Office and turned over to authorities from Shelby County pursuant to a capias warrant which had been issued by Shelby County. Pending before the Court is a Motion for Summary Judgment filed by Defendant Shelby County, Tennessee (Docket Entry No. 40), a Motion for Summary Judgment as to Cross-Complaint filed by Defendant Shelby County (Docket Entry No. 41), and a Motion for Summary Judgment Raising Qualified Immunity (Docket Entry No. 42) filed by Defendants the Metropolitan Government of Nashville and Davidson County ("Metropolitan Government") and Marty Patterson ("Mr. Patterson"). The Motions have been fully briefed by the parties.

## I. FACTUAL BACKGROUND

Mr. Brooks was born in 1947 and resides in Nashville, Tennessee. He is an African-American male, standing five feet, seven inches tall and weighing 210 pounds. Mr. Brooks has

1

brown eyes and black hair. As reflected in the record, he has been issued a Tennessee driver's license with the license number ending in 5101. His Social Security Number ends with 0394. He has been assigned the FBI number 09619DA.

Mr. Brooks was the victim of identity theft. On or about July 9, 1999 and August 11, 1999, Stanley Miller ("Mr. Miller"), using Mr. Brooks' identification, forged checks in Shelby County, Tennessee.[1] After the return of a grand jury indictment, Miller was arrested by Memphis police on September 6, 1999. While being booked by the Shelby County Sheriff's Office, Miller said his name was Ronald Eugene Brooks and that he lived at Mr. Brooks' address. The other identifying information provided by Mr. Miller also matched that of Mr. Brooks.

Mr. Miller was fingerprinted and his mug shot was taken during the booking process.[2] His picture and fingerprints were placed on file and could have been transmitted via telefax or e-mail upon the request of a law enforcement agency. At some point prior to the events at issue in this case, a capias warrant was issued for Mr. Miller's arrest, albeit the information on the warrant actually pertained to the false identity supplied by Mr. Miller. The warrant for the arrest of "Ronald Brooks" and accompanying identifying information was sent to the National Crime Information Center ("NCIC").

On March 30, 2006, the real Mr. Brooks was issued a misdemeanor gambling citation by a Metropolitan Nashville police officer. He appeared at the citations booking area run by the Davidson County Sheriff's Office on April 13, 2006 at approximately 7:24 a.m. to be processed. He was not arrested for the gambling offense, but he was processed into the system.

---

[1]Bank surveillance footage and other evidence indicated that the person passing the forged checks used Mr. Brooks' identity papers.

[2]Miller uses several aliases, including "Donell Mathews" and "Bernard Miller." Prior to the forgery arrest, Miller had been taken into custody at the Shelby County Sheriff's Office and his mug shot and fingerprints were taken under his real name, Stanley Miller. (Docket Entry No. 54 at 5, Ex. X at 41).

2

The Davidson County Sheriff's Office performs booking functions of those arrested or those who turn themselves in for citations, including the taking of fingerprints and mug shots. The Metropolitan Nashville Police Department, which houses the police records, has an identification unit that is responsible for the identification of individuals being booked, through mug shots, fingerprints, and other means. On April 13, 2006, Mr. Patterson was the booking room shift supervisor for the Davidson County Sheriff's Office.

While Mr. Brooks was being processed, the Sheriff's Office checked the NCIC database for outstanding warrants. At approximately 8:00 a.m. two "hits"[3] for forgery were returned. One "hit" was for a warrant issued by Williamson County relating to a forgery in Franklin, Tennessee. The "hit" was for "Miller, Bernard L." with several "a/k/a's," including "Brooks, Ronald." The second "hit" also involved a forgery and was the capias warrant issued by Shelby County for "Ronald Brooks," a/k/a "Ronald Eugene Brooks" in Shelby County.

Based on the "hits," Sheriff's Office employees began to compare Mr. Brooks' demographic and other identifying information against the information on the individuals wanted in these jurisdictions. Employees also contacted Williamson County and Shelby County to confirm the "hits."

After several conversations between Sheriff's Office employees and employees at the Franklin Police Department, it was learned that the Williamson County authorities did not want the individual in custody. Instead, the person they were looking for was Mr. Brooks' son who had been using Mr. Brooks' identity.

There were also communications between Sheriff's Office employees and Shelby County personnel. The Shelby County "hit" identified the person wanted in Shelby County as "Ronald

---

[3]A "hit" is an indication from NCIC that a warrant exists for the arrest of an individual. "Hits" are not uncommon at the Davidson County Sheriff's Office during the booking process and occur approximately 1,000 times a year.

Brooks" a/k/a "Ronald Eugene Brooks," an African-American male, born in 1947, Social Security number ending in 0394, Tennessee driver's license number ending in 5101, with a scar on his right hand. This information and accompanying physical characteristics accurately describe Mr. Brooks, and the FBI number was the same as that listed on the Shelby County "hit."

Mr. Patterson told someone in the Shelby County Criminal Warrants Division that he had a subject matching the description in the Shelby County "hit," and that Williamson County was not taking the subject. Mr. Patterson did not inform Shelby County officials that Williamson County authorities had determined that the individual they sought was actually the son of Mr. Brooks. Shelby County officials told Mr. Patterson it would take at least four hours for someone to come and get Mr. Brooks. Mr. Brooks was detained on the Shelby County "hit" about 9:45 a.m. or 10:00 a.m. and was placed in a holding cell.

When informed of the Shelby County warrant, Mr. Brooks stated that he "had never been to Memphis" and so told Mr. Patterson. However, Patterson confirmed that Mr. Brooks' information matched the information for the man wanted in Shelby County and another employee confirmed that Mr. Brooks had a scar on his right hand as indicated on the Shelby County "hit." Because all the personal information for the Ronald Brooks who appeared at the Davidson County Sheriff's Office matched the personal information for "Ronald Brooks" on the Shelby County Warrant (as related by the NCIC database), Patterson did not request a fingerprint classification or mug shot of the "Ronald Brooks" wanted in Shelby County for the purposes of comparison with Mr. Brooks, even though the "hit" indicated that fingerprints of the wanted subject were on file.

Mr. Brooks and Mr. Miller, the person using his identity, have different FBI fingerprint classifications although, as already indicated, the FBI number on the warrant for Miller who was using Mr. Brooks' name was the same as Mr. Brooks' FBI number. Patterson did not specifically request a fingerprint comparison from the Metropolitan Nashville Police Department and there is no

4

evidence that the Metropolitan Nashville Police Department was involved in this case, other than confirming the "hit" from Williamson County.

Mr. Brooks is a diabetic. While being held in the Sheriff's Office booking area at the Criminal Justice Center in Nashville, Tennessee for the outstanding "hit" in Shelby County, Mr. Brooks informed a "heavyset Caucasian" guard that he was an insulin dependent diabetic. Mr. Brooks had taken his sugar levels that morning and did not tell anyone he was not feeling well or that his blood sugar level needed to be checked. Employees at the Sheriff's Office did not check his blood sugar. Mr. Patterson claims he was unaware that Mr. Brooks is a diabetic and there is no evidence to the contrary.

Mr. Brooks was released at 8:19 p.m. on April 13, 2006 to Shelby County authorities who had traveled from Memphis to Nashville. Mr. Brooks informed the Shelby County deputies who were transporting him to Memphis that they had the "wrong man." Mr. Brooks also informed these deputies that he was a diabetic.

After arriving in Memphis and being processed, Mr. Brooks was examined by Shelby County medical personnel and a nurse checked his blood sugar level. Mr. Brooks did not receive an insulin shot at this time, nor did he request one. The next morning, Shelby County authorities again checked Mr. Brooks' blood sugar level and he was sent to a waiting room to wait to see the doctor.

While in the custody of the Shelby County Sheriff's Office for approximately fourteen hours, Mr. Brooks had access to a telephone. In fact, a Sheriff's Office employee allowed Mr. Brooks to use his cell phone so that Mr. Brooks could attempt to contact his wife. However, Mr. Brooks was not able to contact his wife and speak to her until approximately 1:00 a.m. on April 14, 2006. While Mr. Brooks had told both his wife and mother-in-law when he was still in Nashville that authorities were saying that there were two warrants out for his arrest, he did not tell either that he was being transferred to Memphis.

5

Shelby County authorities determined that Mr. Brooks' fingerprints did not match those of the wanted party. Shelby County authorities corrected the records to ensure that Mr. Brooks would not be arrested again on the capias warrant for the individual using his identity in Shelby County.

While Mr. Brooks was waiting to see the doctor, he was informed that he was being released. Mr. Brooks immediately left without seeing the doctor or getting an insulin shot, although he claims that upon being told he was being released, he repeatedly told Shelby County authorities that he was diabetic and needed his shot. He left the Shelby County Jail at around 2:00 p.m. on April 14, 2006.

Mr. Brooks did not request any assistance from the Shelby County authorities in finding a way back to Nashville because he believed that his sister-in-law, who happened to be in Memphis, would take him back to Nashville. Unfortunately, she had already left Memphis, but Mr. Brooks was able to borrow money from another relative for bus fare.[4]

Mr. Brooks left Memphis on a Greyhound bus around 5:00 p.m. on the day after he self-reported in Nashville. When he arrived in Nashville several hours later, his son met him at the bus station and gave him an insulin shot. After receiving this shot, Mr. Brooks did not seek any medical attention. Two to three weeks later, he visited his doctor to discuss his diabetes and his doctor increased his insulin dose due to his weight gain. Mr. Brooks did not discuss his detention with his doctor.

Mr. Brooks did not suffer any serious medical problems as a result of the foregoing incidents. However, he claims that as a result of his treatment he felt weak and dizzy.

Based upon the foregoing, Plaintiffs filed a six-count Second Amended Complaint. In Count 1, brought pursuant to 42 U.S.C. § 1983, Plaintiffs claim their rights under the Fourth and Fourteenth

---

[4]When processed at the Shelby County Sheriff's office, Mr. Brooks had a small amount of cash on him which was not enough for bus fare from Memphis to Nashville. When he was released from custody, that amount was returned to him in the form of a check which Mr. Brooks was able to cash at a nearby store for a small fee.

6

Amendment were violated when Mr. Brooks was illegally arrested, detained, and not given medication for his diabetes. In Count 2 they seek an injunction against Metropolitan Government, pursuant to 42 U.S.C. § 1983, "prohibiting any African-American citizen to be extradited, transported or deported from Davidson County to any other jurisdiction without verification by mug shot and fingerprint card of the correct identity of the individual." (Second Amended Complaint, Docket Entry No. 29 at 11). In Count 3, Plaintiffs bring a claim against Metropolitan Government and Shelby County pursuant to T.C.A. § 8-8-302 which allows for suits against counties for the wrongdoing of duly appointed deputies who are acting under the color of the office of the sheriff. In Counts 4 and 5, Mr. Brooks brings state law claims for false arrest and negligence. Finally, in Count 6, Mrs. Brooks brings a claim under state law for loss of consortium.

Defendants Metropolitan Government and Mr. Patterson filed a cross-claim against Defendant Shelby County alleging that at all times Metropolitan Government was acting pursuant to the direction of Shelby County. Thus, Defendants Metropolitan Government and Mr. Patterson assert that Defendant Shelby County is liable for damages, if any, awarded to Plaintiffs.

## II. <u>STANDARD OF REVIEW</u>

A party may obtain summary judgment if the evidence establishes there are not any genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. <u>See</u> Fed. R. Civ. P. 56(c); <u>Covington v. Knox County School Sys.</u>, 205 F.3d 912, 914 (6th Cir. 2000). The moving party bears the initial burden of satisfying the court that the standards of Rule 56 have been met. <u>See</u> <u>Martin v. Kelley</u>, 803 F.2d 236, 239 n.4 (6th Cir. 1986). The ultimate question to be addressed is whether there exists any genuine issue of material fact that is disputed. <u>See</u> <u>Anderson v. Liberty Lobby</u>, 477 U.S. 242, 248 (1986); <u>Covington</u>, 205 F.3d at 914 (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986)). If so, summary judgment is inappropriate.

7

To defeat a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue of material fact for trial. If the party does not so respond, summary judgment will be entered if appropriate. Fed. R. Civ. P. 56(e). The nonmoving party's burden of providing specific facts demonstrating that there remains a genuine issue of material fact for trial is triggered once the moving party shows an absence of evidence to support the nonmoving party's case. Celotex, 477 U.S. at 325. A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in its favor. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

### III. <u>APPLICATION OF LAW</u>

As indicated, there are several Motions for Summary Judgment pending before the Court. The Court will consider the Motion for Summary Judgment filed by Defendants Metropolitan Government and Mr. Patterson first since resolution of that motion effectively resolves the remaining Motions for Summary Judgment.

### A. <u>Metropolitan Government's Motion for Summary Judgment</u>

Although captioned as a "Motion for Summary Judgment Raising Qualified Immunity," the Motion is not strictly limited to that affirmative defense. The Motion seeks dismissal of the federal claims against Mr. Patterson on the basis of qualified immunity, as well as dismissal of all other claims for assorted reasons.

#### 1. Federal Claims

In Counts 1 and 2 of the Second Amended Complaint, Plaintiffs bring claims under 42 U.S.C. § 1983 for the denial of constitutional rights. Specifically, in Count 1 Plaintiffs allege that Mr. Brooks was unlawfully arrested and imprisoned based upon the warrant out of Shelby County and

his jailers were deliberately indifferent to his medical needs. In Count 2, Plaintiff seeks an injunction against Metropolitan Government to prohibit such a violation from occurring again with respect to any African-American citizen. Defendants seek summary judgment on the grounds that there was no constitutional deprivation in this case, that the actions of Mr. Patterson are subject to qualified immunity, and that Metropolitan Government is not liable because Plaintiffs have not established a constitutional deprivation or a municipal custom or practice.

Qualified immunity is an affirmative defense which shields "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate 'clearly established' statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The Sixth Circuit has set forth the analysis to be employed in determining whether the defense of qualified immunity applies:

> [A]s a precursor to the Harlow qualified immunity analysis, a court must first determine whether any constitutional violation occurred, let alone the violation of a clearly established right. E.g., Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001); Jackson v. Leighton, 168 F.3d 903, 909 (6th Cir. 1999). Consequently, if [the court] find[s] no constitutional violation, then the case must be dismissed at this threshold stage[.] Where a constitutional violation exists, the court must next determine whether the right infringed was clearly established - by decisions of the Supreme Court, this Court, or other Courts of Appeal - at the time the defendant allegedly infringed it. See Higgason v. Stephens, 288 F.3d 868, 876 (6th Cir. 2002) (citing Walton v. City of Southfield, 995 F.2d 1331, 1336 (6th Cir. 1993)). Finally, if the right is clearly established, we cannot impose liability on a state official unless "the plaintiff has alleged sufficient facts, and supported the allegations by sufficient evidence, to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional right[ ]." Williams v. Mehra, 186 F.3d 685, 691 (6th Cir. 1999)(en banc) (citing Dickerson v. McClellan, 101 F.3d 1151, 1157-58 (6th Cir. 1996)).

McKinley v. City of Mansfield, 404 F.3d 418, 429-30 (6th Cir. 2005). Based upon these standards, and those governing motions for summary judgment, the Court finds that Mr. Patterson is entitled to qualified immunity and that neither he nor Metropolitan Government are liable for a constitutional deprivation.

9

As indicated, Plaintiffs sue Metropolitan Government and Mr. Patterson pursuant to 42 U.S.C. § 1983 as a result of his detention and release to the custody of Shelby County authorities based upon a warrant issued by Shelby County. Plaintiffs claim that the actions of Mr. Patterson in failing to verify further the warrant from Shelby County by checking Mr. Brooks' fingerprints and mug shot with that of the individual named in the warrant violated his Fourth and Fourteenth Amendment rights.

To state a claim under § 1983, a plaintiff must prove that (1) the conduct complained of was committed by a person acting under color of state law; and (2) this conduct deprived the plaintiff of rights, privileges, or immunities secured by the Constitution or laws of the United States. Parratt v. Taylor, 451 U.S. 527, 535, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981). Unfortunately for Plaintiffs, the Court concludes that Mr. Brooks was not deprived of a right or privilege secured by the Constitution or laws of the United States in light of the Supreme Court decision in Baker v. McCollan, 443 U.S. 137 (1979).

In Baker, the Supreme Court set forth the relevant facts as follows:

> Leonard McCollan and respondent Linnie Carl McCollan are brothers. Leonard somehow procured a duplicate of Linnie's driver's license, identical to the original in every respect except that, as the Court of Appeals put it, "Leonard's picture graced it instead of Linnie's." . . . In October 1972, Leonard, masquerading as Linnie, was arrested in Potter County on narcotics charges. He was booked as Linnie Carl McCollan, signed various documents as Linnie Carl McCollan, and was released on bail as Linnie Carl McCollan. Leonard's bondsman sought and received an order allowing him to surrender his principal and a warrant was issued for the arrest of "Linnie Carl McCollan."
>
> On December 26, 1972, Linnie was stopped in Dallas for running a red light. A routine warrant check revealed that Linnie Carl McCollan was wanted in Potter County, and respondent was taken into custody over his protests of mistaken identification. The Dallas Police Department contacted the Potter County Sheriff's Department, compared the identifying information on respondent's driver's license with that contained in the Potter County arrest records, and understandably concluded that they had their man. On December 30, Potter County deputies took custody of respondent and placed him in the Potter County Jail in Amarillo. He remained there until January 2, 1973, when officials compared his appearance against a file photograph of the wanted man and, recognizing their error, released him.

10

Id. at 140-141. Based on these events, the district court entered a directed verdict in favor of Potter County. The Fifth Circuit reversed, reasoning that a jury question existed on the issue of the reasonableness of the identification procedure since the error would have been discovered if Potter County officials had sent identifying material to Dallas or had immediately compared the person being held with the file photographs and fingerprints of the wanted man.

The Supreme Court began its analysis by noting that Linnie McCollan's detention may well have been wrongful under a tort-law analysis, but Section 1983 requires the deprivation of a constitutional right. Id. at 142. The Court then made several observations which are relevant to the present analysis.

The Supreme Court first held that there was no claim under the United States Constitution, even though Linnie McCollan was held in jail for three days until the validity of his protests were ascertained, writing:

> Respondent was indeed deprived of his liberty for a period of days, but it was pursuant to a warrant conforming, for purposes of our decision, to the requirements of the Fourth Amendment. Obviously, one in respondent's position could not be detained indefinitely in the face of repeated protests of innocence even though the warrant under which he was arrested and detained met the standards of the Fourth Amendment. . . . We may even assume, arguendo, that, depending on what procedures the State affords defendants following arrest and prior to actual trial, mere detention pursuant to a valid warrant but in the face of repeated protests of innocence will after the lapse of a certain amount of time deprive the accused of "liberty . . . without due process of law." But we are quite certain that a detention of three days over a New Year's weekend does not and could not amount to such a deprivation.

Id. at 144-145. The Court then observed that Linnie McCollan's innocence of the charges contained in the warrant, while perhaps relevant to a tort claim of false imprisonment, was "largely irrelevant to his claim of deprivation of liberty without due process of law" since the "Constitution does not guarantee only the guilty would be arrested." Id. at 145.

11

Finally, the Supreme Court noted that the Fourteenth Amendment does not protect against all deprivations of liberty, but instead only protects against the deprivation of liberty without due process of law. In this regard, the Supreme Court observed:

> . . . Given the requirements that arrest be made only on probable cause and that one detained be accorded a speedy trial, we do not think a sheriff executing an arrest warrant is required by the Constitution to investigate independently every claim of innocence, whether the claim is based on mistaken identity or a defense such as lack of requisite intent. Nor is the official charged with maintaining custody of the accused named in the warrant required by the Constitution to perform an error-free investigation of such a claim. The ultimate determination of such claims of innocence is placed in the hands of the judge and the jury.

Id. at 145-146.

There are striking parallels between this case and Baker. Mr. Brooks, like Linnie McCollan, was arrested on a warrant issued for someone else who was using his identity and both were detained pursuant to the warrants. The warrants were facially valid. Both Mr. Brooks and Linnie McCollan repeatedly protested their innocence to their jailers, but those protests fell on deaf ears. It was only after a period of time that both were released from custody, after the mistakes were discovered. The Court finds no principled distinction between the facts in this case and those in Baker and thus finds Baker controlling.

Cases since Baker support this Court's conclusion. For example, in Chapman v. City of Atlanta, 192 Fed. Appx. 922, (11th Cir. 2006), Margaret Chapman ("Chapman") brought a Section 1983 claim alleging false arrest and imprisonment as a result of her detention based on a warrant issued for another individual. The warrant sought the arrest of a "Margaret Irene Chapman" and listed the sex, height, weight, race, Social Security number and birth date of that individual. When Chapman attempted to go through customs at the Hartsfield-Jackson International Airport, she presented her identification which matched many of the particulars on the warrant, including the name, birth date, age, and sex. Further, the Social Security numbers were similar. Chapman was held for eighteen hours before the mistake was discovered. Dismissal of her Section 1983 claim was

12

found to be appropriate under <u>Baker</u>, even though the race of the person listed on the warrant was black and Chapman is white.

In <u>Patton v. Przybylski</u>, 822 F.2d 697 (7th Cir. 1987), a warrant was issued for the arrest of "Alexander Patton," listing his address as 1534 West Marquette Road in Chicago, his race as black, and his date of birth as June 30, 1959. Subsequently, another Alexander Patton was stopped by police for a traffic violation. A routine warrants check revealed the warrant for Alexander Patton and the driver was arrested, even though he protested his innocence and the arresting officer refused to take the driver's fingerprints or look at the mugshot of the person wanted in the warrant. The court found no constitutional deprivation, even though there were discrepancies in the addresses of the driver and the person sought in the warrant and they had different birth dates.

In <u>Sanchez v. Swyden</u>, 139 F.3d 464 (5th Cir. 1998) Oscar F. Sanchez ("Sanchez") was proceeding through customs at Houston's Intercontinental Airport when a check revealed an outstanding warrant out of Cheatham County, Tennessee for an "Oscar F. Sanchez" containing a description of the person being sought. That description generally matched Sanchez (including date of birth and Social Security number) and he was subsequently detained. Sanchez argued "that because the defendants were in possession of the actual suspect's photographs, fingerprints, and information that the suspect had a rose tattoo on his left shoulder within two hours after Sanchez's initial detention, the defendants had 'conclusive proof' that he was not the person wanted on the outstanding arrest warrant" and therefore "his constitutional rights were violated because no one compared his fingerprints to those of the suspect until almost twenty-four hours after his initial detention." <u>Id</u>. at 468. The appeals court disagreed stating that the case came "within the compass of <u>Baker</u>" and, in fact, there was no "meaningful distinction between <u>Baker</u> and this case." <u>Id</u>. at 469.

Case 3:07-cv-00507  Document 75  Filed 05/20/08  Page 13 of 21 PageID #: 967

Here, Mr. Brooks was arrested on a validly issued warrant. That warrant contained a description of the suspect which (given the fact that it was based upon someone who had stolen Mr. Brooks' identity) matched Mr. Brooks in virtually all respects. The Court finds that this case, too, falls "within the compass of Baker."

Plaintiffs make much of the fact that this whole situation could have been avoided if Mr. Patterson had simply had Mr. Brooks' fingerprints and mug shot compared with those of the person named in the warrant, or asked Shelby County authorities to bring identifying information with them. While this goes to the issue of negligence, the issue presently before the Court is whether Mr. Brooks was subjected to a constitutional deprivation. In Baker, the Supreme Court found no constitutional deprivation even though, as the dissent pointed out, Potter County deputies did not follow standard identification procedures by taking the pictures and fingerprints in their file with them to Dallas and did not refer to the pictures or prints when they returned with Linnie McCollan to the Potter County Jail.

Plaintiffs also make much of the fact that when Mr. Patterson spoke with Shelby County authorities, he stated Williamson County authorities were not interested in Mr. Brooks, but allegedly failed to tell Shelby County authorities about the fact that Mr. Brooks was not the Brooks that Williamson County authorities were seeking. The Court finds this to be largely irrelevant since Williamson County's determination that the Brooks they were seeking was actually Mr. Brooks' son says nothing about whether Mr. Brooks matched the description of the individual sought by Shelby County authorities. Moreover, in his deposition, Mr. Patterson testified that he did not know the reason why Williamson County authorities chose not to take Mr. Brooks into custody. The record reveals that the information in the warrant from Williamson County did not match Mr. Brooks in many significant respects, including Social Security number, driver's license number, FBI number, location of a scar, and hair color. Thus, Williamson County's refusal to take custody of Mr. Brooks

14

says nothing about whether Mr. Patterson's actions in relation to the Shelby County warrant were constitutional.

Based on the foregoing, the Court will grant summary judgment in favor of all Defendants for Plaintiffs' claimed violation of Mr. Brooks' Fourth and Fourteenth Amendment rights as a result of his alleged false arrest and imprisonment as set forth in Count 1 of the Second Amended Complaint. In that Count, Plaintiffs also make a passing reference to deliberate indifference and Defendants have moved for summary judgment on any such claim. In response, Plaintiffs state that a claim for deliberate indifference to Mr. Brooks medical condition "probably cannot survive summary judgment against either defendant[.]" (Docket Entry No. 54 at 36).

One being detained by state authorities may bring a claim under 42 U.S.C. § 1983 for deliberate indifference to a serious medical need. "Deliberate indifference requires a degree of culpability greater than mere negligence, but less than 'acts or omissions for the very purpose of causing harm or with knowledge that harm will result.'" Miller v. Calhoun County, 408 F.3d 803, 812 (6th Cir. 2005)(citation omitted). Negligence or medical malpractice alone is insufficient to establish deliberate indifference. Perez v. Oakland County, 466 F.3d 416, 423 (6th Cir. 2006).

To establish deliberate indifference, it must be shown that a defendant realized a risk of harm yet consciously disregarded it. This consists of both an objective and subjective component. The medical needs must be objectively, sufficiently serious and a "plaintiff must produce evidence showing 'that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk.'" Id. (citation omitted). "The requirement that the official have subjectively perceived a risk of harm and then disregarded it is meant to prevent the constitutionalization of medical malpractice claims[.]" Comstock v. McCrary, 273 F.3d 693, 703 (6th Cir. 2001).

15

Plaintiffs have produced insufficient evidence for either prong of the test. The record shows that while Plaintiff may have stated to an unnamed guard at the Sheriff's Office he was an insulin dependent diabetic, there is no evidence that Mr. Patterson was even aware that Mr. Brooks was diabetic, let alone that he was in some sort of medical distress. Further, upon his arrival at the Shelby County Jail, the contractual health care provider examined Mr. Brooks and monitored his condition. When Mr. Brooks learned he was being released from the Shelby County jail, he was waiting to see the doctor. Nevertheless, he chose to leave rather than see the doctor. Mr. Brooks went to see the doctor several weeks after his release, but he did not even mention the events in question. There is no evidence that any delay in his receiving an insulin shot resulted in some sort of detriment to his health. Thus, summary judgment is appropriate on the deliberate indifference claim set forth in Count 1.

In Count 2 of the Second Amended Complaint, Plaintiffs seek an injunction based upon the alleged policy and custom of Metropolitan Government to fail to properly "investigate 'hits' from charges pending in other jurisdictions against African-American citizens." (Docket Entry No. 29, Count 2). A municipality may be liable for a constitutional violation caused by individuals when those individuals acted pursuant to an official policy of the municipality. See, Monel v. New York City Dept. of Social Services, 436 U.S. 658, 691 (1978). For municipal liability to exist, however, a constitutional violation must take place. City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986); Watkins v. City of Battle Creek, 273 F.3d 682, 687 (6th Cir. 2001) ("If no constitutional violation by the individual defendants is established, the municipal defendants cannot be held liable under § 1983.") Under the facts presented in the summary judgment record, the Court has found no constitutional violation with respect to Mr. Brooks' detention and therefore there is no municipal liability.

Moreover, in order to set forth a cognizable § 1983 claim against a municipality, a plaintiff must prove that a municipal policy or custom was the moving force behind the violation. <u>Memphis American Postal, AFL-CIO v. Memphis</u>, 361 F.3d 898, 902 (6th Cir. 2004). Here, Plaintiffs claim that the policy or custom of the municipal government was grounded in inaction, that is, "[i]t is the policy and custom of Defendant Metropolitan Government . . . to inadequately and improperly investigate 'hits' from charges pending in other jurisdictions[.]" (Docket Entry No. 29, Count 2).

To establish a municipal liability claim under an inaction theory, Plaintiffs must show "(1) a clear and persistent pattern of illegal activity, (2) which the Department knew or should have known about, (3) yet remained deliberately indifferent about, and (4) that the Department's custom was the cause of the [deprivation] here." <u>Thomas v. City of Chattanooga</u>, 398 F.3d 426, 433 (6th Cir. 2005). Plaintiffs have established none of these factors.

In their response to the Motions for Summary Judgment, Plaintiffs state "[t]he source of Metro's problem was in dividing the out-of-town 'hit' processing between the police department and the sheriff's department" such that the "left hand did not know what the right was doing." (Docket Entry No. 54 at 31). Even so, this hardly established that there was a clear and persistent pattern of activity that the Metropolitan Government knew or deliberately remained indifferent about which led to constitutional deprivations. For all the Court knows, this was an isolated case as Plaintiffs have presented no evidence to the contrary. Accordingly, summary judgment will be granted on Count 2 which requests injunctive relief against Defendant Metropolitan Government.

**2. State Law Claims**

In Counts 3 through 6, Plaintiffs assert various state law claims. In their Motion for Summary Judgment, Metropolitan Government and Mr. Patterson argue that if the Court determines that there are no viable federal claims, the Court should decline to exercise supplemental jurisdiction over the state law claims. Alternatively, those Defendants request that the Court dismiss the state law

17

claims on the merits. Plaintiffs did not respond to the state law claim arguments in their Response Brief.[5]

Federal district courts have "supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). When a district court has dismissed all claims over which it had original jurisdiction, the court has discretion to "decline to exercise supplemental jurisdiction" over state law claims with respect to which it initially asserted jurisdiction. § 1367(c)(3). The discretion in deciding whether to exercise supplemental jurisdiction over state law claims is broad. Musson Theatrical, Inc. v. Federal Exp. Corp., 89 F.3d 1244, 1254 (6th Cir. 1996).

When deciding whether to exercise supplemental jurisdiction, a court should consider factors such as judicial economy, convenience, fairness, and comity. City of Chicago v. International College of Surgeons, 522 U.S. 156, 173 (1997). However, "'in the usual case in which all federal law claims are eliminated before trial, the balance of factors to be considered ... will point toward declining to exercise jurisdiction over the remaining state-law claims.'" Robert N. Clemens Trust v. Morgan Stanley DW, Inc., 485 F.3d 840, 853 (6th Cir. 2007) quoting Carnegie-Mellon Univ v. Cohill., 484 U.S. 343, 350 n. 7 (1988). Thus, "it is ordinarily prudent for a district court that dismisses a plaintiff's federal claims to decline to reach plaintiff's state law claims" unless the concerns of judicial economy

---

[5]Defendants Metropolitan Government and Mr. Patterson assert that they are entitled to summary judgment because of Plaintiffs' failure to respond to the motion on the state law claims, and cite for that proposition this Court's decision in Sallee v. Tennessee Dept. of Safety, 2006 WL 3469577 (M.D. Tenn. 2006). While the Court did observe that Sallee's failure to respond to arguments relating to two of the counts in her complaint meant she had no opposition to dismissal under the Local Rules, the Court immediately followed that observation with the statement that Defendants "have shown their entitlement to summary judgment as a matter of law" on those counts. Id. at *1. This is in keeping with Fed. R. Civ. P. 56(c)'s mandate that summary judgment be granted *if* the record shows there are no genuine issues as to a material fact and the movant is entitled to judgment as a matter of law.

18

and avoidance of multiplicity of litigation overrides the notion that federal courts should not "needlessly decid[e] state law issues." Sextella-Wright v. Sandusky City Sch. Dist., 2007 WL 451498 at *2 (6th Cir. 2007).

In this case, judicial economy and convenience suggests retention of the state-law claims in light of the fact that the parties have completed discovery and the state-law issues are before the Court on dispositive motions. However, the Court finds it prudent not to decide the state-law issues based upon comity and fairness. Although dismissal will result in some delay and another filing fee, the pretrial discovery materials will be available for use in state court if the parties proceed to resolve the remaining state claims.

The liability or non-liability of Defendants Metropolitan Government and Mr. Patterson is not altogether clear with respect to each and every claim in Counts 3 through 6. For example, Metropolitan Government and Mr. Patterson assert that dismissal of the state-law negligence claim is warranted in light of the fact that they are entitled to summary judgment on the federal claims in light of Baker. However, they provide no controlling authority for the proposition that a state court would employ a Baker-type analysis to a negligence claim for false imprisonment, and the Supreme Court in Baker took pains to point out that its decision did not rest on common law principles sounding in negligence. The Court finds it prudent to follow the customary course of dismissing the state-law claims so as to not be placed in the position of needlessly deciding a state law question. See, Saxbe v. Dlusky, 2008 WL 647165 at *4 (6th Cir. 2008)(district court did not abuse discretion in dismissing state law claims after granting motion for summary judgment on federal claims); Thomas v. Evansville-Vanderburgh Sch. Corp., 2007 WL 4532844 at *4 (7th Cir. 2007)(stating that plaintiff did not show abuse of discretion in district court's declining to exercise supplemental jurisdiction even though matter was before the court on motion for summary judgment "after extensive discovery on both sides"); McBee v. Delica Co., Ltd., 417 F.3d 107, 128 (1st Cir. 2005)(dismissal of state law claim

19

at summary judgment stage after "extensive discovery" was appropriate with appellate court stating "[a]bsent any viable federal claim, the district court's dismissal of all of [plaintiff's] pendent state law claims (without prejudice to their being refiled in state court) was fully appropriate."). Accordingly, the state law claims will be dismissed without prejudice.

**B.** **Shelby County's Motion for Summary Judgment as to Plaintiffs' Claims**

In its Motion for Summary Judgment, Shelby County raises many of the same arguments as those raised by Metropolitan Government and Mr. Patterson. Plaintiffs have indicated that they have no objection to the grant of summary judgment in Shelby County's favor because "[i]t is plain as pikestaff that Baker . . . precludes any relief against Shelby County." (Docket Entry No. 54 at 34).

For the reasons explained in the previous section, the Court will grant summary judgment in favor of Shelby County in relation to Plaintiffs' federal claims. Since the state-law claims are being dismissed, its request for summary judgment on those claims will be denied.[6]

**C.** **Shelby County's Motion for Summary Judgment as to the Cross-Claim**

Shelby County has filed a Motion for Summary Judgment with respect to the cross-claim filed by Defendant Metropolitan Government. That cross-claim seeks indemnity on the grounds that if either Defendant Metropolitan Government or Defendant Mr. Patterson are found liable for any of Plaintiffs' claims, those Defendants should be indemnified by Shelby County.

Given this Court's prior conclusions, the Motion for Summary Judgment on the Cross-Claim will be denied as moot. The Court has determined that there are no viable federal claims in this case and judgment will be entered on those claims, meaning that there is no issue about indemnity relating to the federal claims. The remaining state law claims are being dismissed. If Plaintiffs refile an action

---

[6]Whether Plaintiffs' pikestaff observation holds true with respect to its state-law claims against Shelby County is not something the Court is in a position to decide given its decision to dismiss the state law claims.

in state court, it will be for the state court to determine the issue of indemnity relating to state- law claims should a claim for indemnity be presented to the state court.

## IV. CONCLUSION

Based on the foregoing, the Court will grant in part and deny in part the Defendants' Motions for Summary Judgment (Docket Entry No. 40 & 42) as to Plaintiffs' claims. Those Motion for Summary Judgment will be granted with respect to the federal claims, but denied with respect to the state-law claims which will be dismissed without prejudice. Defendant Shelby County's Motion for Summary Judgment as to the Cross-Claim (Docket Entry No. 41) will be denied as moot.

An appropriate Order will be entered.

_____
ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE

21